Filed 11/9/22  P. v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR GARCIA et al.,<br><br>    Defendants and Appellants. | H046635<br>(Santa Clara County<br>Super. Ct. No. B1793599) |

Defendants Hector Garcia and Blanca Torres appeal from judgments entered after separate juries in a joint trial found them guilty of committing sexual offenses against a four-year-old child.  The trial court sentenced Garcia to 80 years to life in prison and Torres to 55 years to life in prison.

Between their two appeals, Garcia and Torres raise 17 claims of error.  Stated broadly, they separately or jointly contest the trial court's admission of evidence (including evidence about child sexual abuse accommodation syndrome (CSAAS)), the CALCRIM No. 1193 jury instruction on the use of CSAAS evidence, the prosecutor's statements in rebuttal argument about the reasonable doubt standard, the cumulative prejudice of the alleged errors, and various aspects of their sentences.

For the reasons explained below, we reject Garcia's and Torres's challenges to their convictions but vacate their sentences and remand with directions for resentencing.

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural History*

In August 2018, the Santa Clara County District Attorney filed a first amended information (information) charging Garcia and Torres with eight sex crimes committed against four-year-old A. Doe on or about and between January 1, 2017, and March 31, 2017.[1]  The charges comprised two counts of sexual intercourse or sodomy with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a);[2] counts 1–2), two counts of oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b); counts 3–4), and four counts of forcible lewd or lascivious act on a child under age 14 (§ 288, subd. (b)(1); counts 5–8).  Additionally, the information charged Garcia with misdemeanor false representation of identity to a peace officer (§ 148.9, subd. (a); count 9).

After the trial court ruled that Garcia's statement to police about touching A. at Torres's direction was admissible only against Garcia, the court empaneled separate juries to hear the evidence against Garcia and Torres in a joint trial.

In October 2018, Garcia's jury found him guilty on counts 1–8.[3]  Torres's jury found her guilty of all counts except count 2, on which the jury did not reach a unanimous verdict.  The trial court declared a mistrial on count 2 and dismissed that count upon a motion of the district attorney.

On December 10, 2018, the trial court sentenced Garcia to consecutive terms of 25 years to life on counts 1 and 2, plus consecutive terms of 15 years to life on counts 3 and 4.  The court also imposed stayed terms of 10 years on each of the remaining counts (counts 5–8), pursuant to section 654.  The court ordered payment of various fines, fees,

---

[1] "Doe" is a pseudonym used in the information.  We refer to the minor victim by the first initial of her first name and other witnesses by their first names and initials to protect their privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

[2] Unspecified statutory references are to the Penal Code.

[3] Before trial, Garcia pleaded no contest to count 9 (§ 148.9, subd. (a)).

and assessments, including a "Court Security Fee of $320" (§ 1465.8), "Criminal Conviction Assessment Fee of $280" (Gov. Code, § 70373), and "$129.75 Criminal Justice Administration Fee to the City of Sunnyvale" (Gov. Code, former § 29550 et seq.).[4]  Additionally, on misdemeanor count 9, the court imposed a concurrent 120-day county jail term and "waive[d] the fees on the misdemeanor."

On December 17, 2018, the trial court sentenced Torres to 25 years to life on count 1, plus consecutive terms of 15 years to life on counts 3 and 4.  The court also imposed stayed terms of 10 years on each of the remaining counts (counts 5–8), pursuant to section 654.  The court ordered payment of various fines, fees, and assessments, including a "Court Security Fee of $280" (§ 1465.8), a "Criminal Conviction Assessment Fee of $210" (Gov. Code, § 70373), a "$129.75 Criminal Justice Administration Fee to the City of Sunnyvale" (Gov. Code, former § 29550 et seq.), and two $300 fines, plus penalty assessments, under section "290.3."[5]  Additionally, the court ordered Torres to submit to a blood test for evidence of HIV (§ 1202.1).

B.  *Evidence Presented at Trial*

1.  Prosecution Evidence

A. was born in November 2012, and was four years old at the time of the charged crimes and five at the time of trial.  A.'s 22-year-old mother Maria testified that Torres babysat A. at Maria's request about four times between January and March 2017.[6]  Torres had an adult daughter, Jessica C., who was Maria's friend and coworker.

---

[4] We note a discrepancy in the record between the trial court's oral pronouncement of a $280 criminal conviction assessment fee and the clerk's sentencing minutes reflecting the amount of that fee as "$240."  Specifically, the clerk's minutes state that the trial court ordered a "$240" "ICMF" fee, which corresponds (except as to the amount) to the ordered "Criminal Conviction Assessment Fee of $280" (see Gov. Code, § 70373 [also referred to as a court facilities assessment]).

[5] Contrary to the trial court's oral pronouncement at Torres's sentencing hearing, the abstract of judgment and clerk's minutes state that the court imposed one $300 fine under section 290.3 and another $300 fine under section 290.85.

[6] Unless otherwise indicated, all dates were in 2017.

During the period that Torres babysat A., A.'s grandmothers also watched her. In addition, Maria had two roommates, Mary and Miguel. Maria had an intimate relationship with Miguel for about four or five months while they roomed together. Neither Mary nor Miguel watched A., but Mary did sometimes drop A. off at her grandmothers' homes. Maria did not notice anything wrong with or unusual about A.'s vaginal area or private parts during the period that Torres babysat A. Further, Torres did not say anything to Maria about A. having redness on her private parts or having said that Miguel had licked her private parts. Once, Torres contacted Maria and asked when she (Torres) would see A. again. Maria thought this was strange.

Maria told A. weekly that no one (except her mother and her grandmothers) was allowed to touch her private parts. Maria repeatedly said this to A. because Maria had been sexually molested around age four, but Maria never told A. about that molestation.

One night, around July 19, as Maria and A. were lying down getting ready for bed and acting playfully, A. moved Maria's hand toward her (A.'s) vagina area and made a humping motion. Maria asked A. why she was doing that. A. said, " 'I don't know.' " Maria continued questioning A. about what she had done and asked " 'who showed you this?' " Eventually, Maria said to A. " 'This isn't a game. You need to tell me what's going on.' " A. responded that Torres (whom she called "Chewbanca") had touched her in her vagina area.[7] A. said the touching happened about two times and she had told Torres to stop but Torres did not want to " 'because [Torres] liked it.' "[8] A. said she was

---

[7] Maria testified that A. called her "privates" her "colita," meaning "the whole area, the whole vagina and bump (phonetic) area." Maria further said that A. sometimes referred to the entire area as her "butt." Additionally, A. testified that her " 'colita' " is "the part where [she] go[es] pee."

[8] The trial court allowed the " 'because [Torres] liked it' " statement into evidence over Torres's objection and motion to strike it as speculation. The court instructed the jury that that statement was admitted not for its truth but to explain the witness's (i.e., Maria's) conduct.

scared, and she sounded sad to Maria. Before this disclosure, Maria had not seen A. act in any way that made Maria suspicious that someone had touched A.

The next day (July 20), Maria contacted the Sunnyvale police. When Maria told A. that they were going to see the police and the police would ask her some questions, A. asked why. Maria explained that the questions would be about what A. had disclosed regarding Torres. A. again said she was scared. A. then mentioned Torres's boyfriend (whom she later identified as Garcia) and said "that she saw something in a w[ie]ner-like figure." A. also said that Garcia had touched her and Torres was holding a light when he did that. Maria testified that A. said Garcia had put the "hotdog" in her vagina area. Additionally, Maria had previously told the police that A. said " '[Garcia] put this soft thingy, put it in my butt.' " Maria asked A. why she had not talked about this situation earlier. A. said she was scared but no one had threatened her.

On August 10, A. was medically examined and interviewed by a police detective. Physician assistant Mary Ritter conducted the sexual abuse examination. The exam did not reveal anything remarkable, and Ritter did not find any signs of trauma or penetration. Ritter explained that, given the timing of the alleged events, an injury from penetration could have healed by the time of her examination. Ritter also said that her findings could be consistent with either sexual abuse or no sexual abuse.

Detective Elizabeth Digiovanna interviewed A. on August 10. A. told Detective Digiovanna that Torres had touched her butt " 'cause [her] butt was red." A. also described "a big [] thing that his butt rode. [¶] . . . [¶] It's like a [] hot dog. But more softer [sic]. [¶] . . . [¶] It was so squishy." Torres touched A.'s butt after A. said "don't touch my butt. My mom will get mad." Torres touched A. with "the hot dog thing, more squishier [sic] and more like saltier." The first time Torres touched A., "[s]he laid [A.] down and that hurt a lot. [¶] . . . [¶] She was pushing it like too hard. [¶] . . . [¶] And that [] hurt a lot." When asked to talk about "the second time," A. responded, "Because

5

she want to [*sic*] 'cause she likes it." When asked more directly if there was another time that Torres had touched her, A. said, "No."

A. told Detective Digiovanna that Garcia had touched her butt. A. said Garcia had something growing in his butt and "she put it inside . . . . It was tickling me. And I feel it. [¶] . . . [¶] It's like something soft." Garcia put something like a "corndog" (which grew from his groin area and was "slimy" with a "blanket") in her butt. Torres was present at the time and used a light on her phone. A. further reported that Torres and Garcia took her to a "car house." There, A. "was laying down [in the bed], 'cause [Torres] wanted to touch [A.'s] butt." A. said Torres did not touch her butt every time that she had gone to Torres's home.

On August 15, Detective Digiovanna and Detective Ruben Cortez facilitated a recorded pretext phone call between Maria and Torres. During the call, Maria told Torres that A. had said Garcia "showed her some things and he touched her in an inappropriate place." Torres responded, "Yes Maria, do you remember that one time I . . . had told you that I wanted to talk with you. I told [] Jessica, the little girl . . . [¶] . . . [¶] . . . I told you that I wanted to talk with you because I would see that the little girl, her behavior was not right." Torres further said that Garcia was not present while she babysat A., she never left A. alone, and the only time Garcia saw A. was when they once picked him up at work and went to get ice cream. Torres also said A. had mentioned a man named Miguel and had said that Miguel did something to her with his mouth.

After the pretext call, Maria and Torres met in a restaurant parking lot and the police recorded their conversation. Torres denied taking A. to her RV. Torres said that she would help Maria investigate the situation and find Garcia, who was homeless and had last been living in his vehicle behind a supermarket. She also said that she had thought about calling social services about what A. said to her but did not do so because she did not want to be a bad person.

6

On August 17, Detective Digiovanna met with A. and showed her a photograph of Garcia. A. identified Garcia as Torres's boyfriend. When asked to talk about him, A. said, "He just put that . . . hot dog in my butt, and she – he put it right now." A. further said that Torres "touched [] my butt the first time. . . . The first time when he touched my butt. [¶] . . . [¶] The first time, when my mom take me there, the first time. . .[] he touched my butt. [¶] . . . [¶] 'Cause he wanted to."

The police arrested Garcia and Torres on August 17. Detective Cortez interviewed Garcia. A video of the interview was played for Garcia's jury (but not Torres's jury). In the interview, Garcia said that he recalled Torres watching A. about twice, once at Torres's apartment and then at a house that had an RV parked in the backyard. Garcia said the first time Torres watched A., A. woke him up while naked (after Torres had bathed her), tried to put makeup on him, and wanted to kiss him on the mouth. A. also wanted to touch his penis and touched herself.

Garcia said that he and Torres had sex while A. was in the bedroom; they thought A. was asleep. Garcia and Torres "play[ed] around with the girl," and he looked at A.'s vagina because it was "chafed." Torres told Garcia to play with and touch A. "like a woman." Torres held her phone and watched as Garcia touched A., including on her legs and buttocks. Garcia also said that he slightly touched A.'s vagina "almost by accident" with the back of his hand. Garcia repeatedly denied that he had sexually abused or penetrated A. Garcia also told Detective Cortez that Torres might have been interested in children sexually because of the pornography she watched.

Detectives Digiovanna and Cortez interviewed Torres on August 17. Torres recalled watching A. three times at her apartment and initially said Garcia was not present any of these times. Torres said that the first time she watched A., A. had a burning sensation when she urinated, so Torres gave her a bath. Torres contacted Maria to get clean clothes for A., but when Maria said she could not bring any, Torres bought A. new underwear. Torres said that she noticed A.'s " 'parts' " were red, and A.

7

demonstrated a licking motion, saying Torres had to lick her to make it feel better. Torres did not tell the detectives that she had put Desitin cream on A. or had used a light on her phone to guide A. to the bathroom.

During the interview, Torres initially said A. had mentioned the name Miguel, but A. did not say he had abused her. Later in the interview, Torres mentioned Miguel and Mary as people who might have abused A., and that Miguel and Mary showed A. pornographic movies. A. told Torres that she (A.) could perform the acts she had seen in the movies, and she made a grinding motion on a stuffed animal. A. also said that Miguel put something inside her and it hurt because she is too little. In addition, Torres said she had told her daughter Jessica and friend Ana H. about Miguel.

Torres made clear to the detectives that she thought Maria was an irresponsible mother who drank and smoked marijuana in front of A., put A. around many men, and did not take care of her or keep her safe. Torres said that when she told Maria about A.'s behaviors, Maria did not care. Torres also said she did not contact child protective services because she did not know exactly what had happened to A.

Torres explained that Maria made up this story of abuse and might have been mad at Torres over an unrelated $300 rental agreement fee that Maria owed her. Torres believed that Maria had coached A. to say things. Torres said she was mad at Maria because she would not listen to Torres. Torres also said she was upset with Maria because Maria did not buy medicine for A. when she needed it and Torres had to buy A. underwear.

After Torres eventually admitted to the detectives that Garcia had been around A., Torres told the detectives that A. was curious about Garcia, wanted to play with and be around him, sat on his lap, and pretended to put makeup on him. Torres denied touching A. inappropriately and said she and Garcia were never alone with A. in Torres's RV. Torres also denied photographing A., but said she no longer had the phone she had at the time she babysat A. because it had been stolen.

8

A. testified at trial that Torres had "touched [her] colita" and Garcia "had a little thingy on his colita [that] he put in [A.'s] colita." A. described the "thingy" or "little weenie" as long and feeling "weird and wet." Torres held Garcia's weenie and "put it on [A.'s] colita" while A. was on the bed in Torres's bedroom. A. touched Garcia's weenie and it felt wet and hot. Garcia held up a light on Torres's phone for Torres to see. The touching made A. feel mad and sad.

Torres also touched A.'s colita in a "camping car," which made A. feel "very, very mad." Torres had said Garcia was "gonna get the little weenie thing to touch [A.'s] colita. And [A.] said -- 'I wanna tell my mom' -- but [Torres] said, 'Don't tell her.' But [A.] just told her."

When asked by the prosecutor if there was anything else Garcia had done that A. did not like, A. testified that Torres "said to go to [Garcia] and rub some soap on the little weenie thing." Torres gave A. the soap and told her to "rub it and get on him" like "getting on the chair." As this was happening, Garcia was "[r]elaxing and laying down." This made A. feel "[v]ery weird and sad and mad." A. also testified that Torres once bought her some toy makeup that she put on her face. A. did not put any makeup on Garcia.

A. testified that Miguel never touched her and she never told Torres that Miguel had put his tongue on her private parts.

On cross-examination, A. acknowledged that she had previously testified about Torres putting cream on her colita.[9] A. remembered having a burning sensation in her colita, but it did not hurt. A. said that Torres had touched her "like, three times." After first stating that Torres "[m]aybe" had cream on her hand when she touched her, A. testified that Torres did not put any cream on her. A. also remembered previously

_____

[9] During the prosecution's case in chief (and upon stipulation of the parties), A.'s preliminary hearing testimony was read to the jury. In that testimony, A. said Torres had touched her colita one time and Garcia had touched her colita one time.

9

testifying that Garcia had touched her on the inside of her colita. A. testified that she had said this because defense counsel told her that and she was just asking if that was the right answer. In addition, A. admitted that she had previously testified that Garcia touched her with his hand. She explained that she had said that because she was embarrassed to say that he had touched her with his penis, so she "pretended" and lied.

Clinical psychologist Dr. Blake Carmichael testified as an expert on child sexual abuse accommodation syndrome (CSAAS).[10]

### 2. Defense Evidence

Torres testified on her own behalf in front of both juries. Torres said she did not observe Garcia touch A. in any inappropriate way, and she did not see or take part in any inappropriate behavior with Garcia and A. Torres further testified that she never left A. alone with Garcia "except to go to the bathroom or the kitchen." Torres also denied asking Maria to bring A. over to her home.

During the period that Torres watched A., Torres lived in an apartment with her two children and another family that included Ana H., her husband, and three children. The first time Torres watched A., Maria dropped A. off at the apartment in the evening. Garcia arrived sometime later that night. When A. used the bathroom, A. said she had a burning sensation and was not able to urinate. Torres looked at A.'s private parts and they were "very irritated, reddish." Torres bathed A. and asked Ana for some of her Desitin cream. As Torres was drying A. off, A. made a movement with her tongue and said "if [Torres] licked her the way [her mother's boyfriend] Miguel did, then she would be able to feel better." Torres applied cream over the surface of A.'s private parts. Torres did not insert her finger inside A.'s vaginal area. In the past, Torres used Desitin cream the same way with her own children and when she worked at a child daycare

---

[10] We discuss Dr. Carmichael's testimony *post*, in our discussion of the claims for relief (see part II.A.1.).

10

facility.  Because Maria had not included any underwear in the clothes that she left with Torres, Torres went to a store to buy A. underwear.

Later, after Garcia left the apartment, Torres and A. went to Torres's bedroom. While A. was playing with stuffed animals under a blanket, Torres noticed A. making "strange movements on top of one of the stuffed animals."  When Torres asked A. about this, A. "seemed slightly embarrassed" and said she was doing it " 'because Mary and Miguel, that's what I see them do.' "  After A. and Torres slept some, A. asked to use the bathroom.  Torres turned on the light on her cell phone to guide A. to the bathroom. Torres asked A. about how her private parts felt.  A. said she felt better, and Torres decided to apply more cream to A.

In the morning, when Maria came to pick A. up, Torres told Maria what A. had said and done, informed Maria of the names A. had mentioned, asked who those people were, and told Maria about A.'s redness.  Maria responded that A. "was trippin'."

Later, Torres decided to talk to her daughter Jessica and roommate Ana.  Torres told Ana about what A. had said and done and asked for Ana's advice.  Torres thought about reporting the situation, but Torres did not contact the police or child services "[b]ecause there were many things [Torres] wasn't sure [about]."

Torres watched A. on three other occasions.  During the fourth (final) occasion, Torres, Garcia, and A. went from Torres's apartment to her daughter's house (where the RV was parked).  Torres went inside the RV for "[s]econds" to retrieve a sweater for A., but Torres did not take A. inside the RV.

Torres denied filming or taking pictures of A.  Torres admitted that she was untruthful when talking to Maria in August 2017 about Garcia's whereabouts and the contact she (Torres) had with him.  Torres explained that she did not know what was going on, did not think Garcia had touched A., and wanted to talk to him.  Torres later confronted Garcia about the abuse allegations and believed what he said to her.

11

On cross-examination, regarding the first time she babysat A., Torres said that she had purchased "little girl's makeup" for A. and A. tried to put the makeup on Garcia in the kitchen. Torres denied that she and Garcia had sex while A. was in the bedroom. She also denied telling Garcia to play with A., give her a spanking, or touch her like a woman. Torres admitted to having watched pornography for some time (including on the cell phones recovered by the police) and that some of the pornography included three participants. Torres said she had watched pornography alone and with Garcia.

Garcia did not testify before either jury.

Torres's daughter Jessica C. testified before both juries. She corroborated that on the day after Torres first watched A., Torres relayed a story about A. "sticking out her tongue," "asking to [] kiss" Torres, and "just do[ing] [] weird movements with her mouth, saying that someone showed her how to do that." Torres also asked Jessica if a name that started with an " 'M' " sounded familiar. Jessica suggested the name Miguel, and Torres also mentioned Mary. Torres asked if she should make a report to child protective services or the police. Jessica told Torres to " 'just leave it alone' " because Maria "would just take it the wrong way," "wouldn't really see the seriousness in it," and "might just even ignore it."

On cross-examination, Jessica acknowledged telling the police that Torres did not say " 'that it was Miguel.' " Jessica also admitted talking to Torres (before she had watched A.) about Maria and Miguel and Jessica's feeling that A. did not act appropriately around men. Jessica recalled Torres saying that Mary taught A. about kissing and A. had a rash, so Torres gave her a bath and put rash cream on A.

Torres's friend and roommate Ana H. testified before both juries. She recalled Torres asking if she could use the bathroom while she was watching a young girl. Ana did not remember if Torres asked to use her cream. Ana recalled that the next day, Torres said that she thought something was going on with the girl (including that the girl had been touched) and was concerned about the girl's behavior. Ana told Torres that if

12

she wanted to do something, she should " 'call child protective services or stay away from that child because you are gonna get in trouble or you might get blamed for it.' " Torres mentioned the name Miguel when telling Ana about what the girl had said, and Torres said she had given the girl a bath because she had some redness or itchiness.

On cross-examination, Ana expanded on what Torres had relayed about the girl: "[T]he little girl would tell her that this guy would do something in her butt with his tongue and that she was being touched and that she would like to sit on the men's, [*sic*] and that was concerning for [Torres]." Torres also had said the girl "would move her tongue in . . . weird ways, that she didn't understand . . . why -- a little girl should not be doing that kind of stuff."

Dr. Bradley McAuliff testified (before both juries) as an expert on child suggestibility and forensic interviews of children. Dr. McAuliff described suggestibility as "looking at the accuracy of memory or the accuracy of a witness's report." He discussed the academic study of suggestibility and the factors that relate to or influence child suggestibility, including direct repeated questioning, "interviewer authority," "cross-contamination," "source monitoring," and the child's age. Dr. McAuliff stated that "the general pattern in suggestibility is that with preschoolers, . . . kids age[d] zero to five, they're the most suggestible, which means they're most easily influenced" by the factors he described. Dr. McAuliff addressed the potential for suggestibility in the context of various hypotheticals based on circumstances similar to those in this case.

On cross-examination, Dr. McAuliff stated his concern that A.'s disclosure of molestation in this case was not a "spontaneous disclosure," but rather "prompted by [Maria], who had prior experiences, [and] who was insistent on asking questions." He also noted that Torres had described nonsexual touching (i.e., the use of Desitin cream) and A. could have made "an inference based on the context and the way these questions [were] being asked [by Maria] that this was a bad thing and that somehow [Torres] enjoyed it." Dr. McAuliff said he had concerns about how A. knew that Torres "liked it."

13

Regarding source monitoring, Dr. McAuliff said he was concerned about "the conversations [A. had] with [her] mom; the way mom questioned [A.]; the fact that [Torres] said there was nonsexual touching of the vagina; and the fact that [A.] had disclosed prior abuse" (i.e., A.'s alleged statements to Torres about Miguel). Dr. McAuliff also said Detective Digiovanna's interview of A. was "a good forensic interview."

Psychologist Dr. Hy Malinek testified (before Garcia's jury only) as an expert in psychology, the diagnosis of mental disorders, and the determination of whether an individual has a predisposition or inclination to commit sex offenses against children. Dr. Malinek had interviewed Garcia, administered personality tests to him, and reviewed case material and Garcia's criminal history report. Based on the totality of the information available to Dr. Malinek, he concluded that Garcia was not predisposed to commit sexual offenses and "cannot be diagnosed with pedophile or antisocial personality disorder." Dr. Malinek noted that Garcia had no prior charges or convictions, had "no other reports that he is into children sexually," had been married, had four children, and had maintained a sexual relationship with an adult woman for three years. According to Dr. Malinek, "All these are not marks of pedophiles." Additionally, the personality testing showed Garcia to be a "passive, kind of dependent kind of guy, who is inclined to be compliant, . . . tends to be self-effacing, tends to be . . . more inflexible, [and a] more psychologically naïve kind of guy." Dr. Malinek's "overall impression" of Garcia was that he allowed Torres to make decisions for him, and he was dependent on her.

Detective Matthew Hutchison testified (before Garcia's jury only) that he interviewed Torres on August 18 (the day after her arrest and interview with Detectives Digiovanna and Cortez). Hutchison played for Torres a portion of Garcia's August 17 interview in which he had admitted touching A. at Torres's direction. As Torres watched

14

the video, her hands shook, she held her head down low, and covered her eyes with her hand. Torres also repeatedly said " 'Oh. My God' " and called Garcia " 'stupid.' "

### 3. Stipulations

The district attorney and Garcia stipulated to the following (before Garcia's jury only):

"Hector Garcia's phone that was found on his person when he was arrested had four deleted commercial adult pornography videos in the deleted portion of the phone. [¶] It was undetermined when these videos were originally viewed. Two of the videos were deleted on August 12th, 2017, and two of them were deleted on August 16th of 2017."

"Torres had on both of her phones, the pink phone found in the RV, and the other phone found in her car, . . . [a] total [of] over 900 entries in her web browser history for all types of commercial adult pornography, some with titles including 'incest' and 'young teen pornography.' "

## II. DISCUSSION

Torres and Garcia raise 17 claims of error. Garcia and Torres jointly argue: (1) the trial court erred by admitting Dr. Carmichael's testimony about CSAAS; (2) the trial court erred by allowing Dr. Carmichael to testify about certain case-specific hypothetical scenarios; and (3) the trial court erred by instructing the juries with CALCRIM No. 1193 (CALCRIM 1193).

Torres separately argues: (1) the trial court erred by admitting evidence that A. made a statement that Torres touched A. because she (Torres) liked it; (2) the alleged errors were cumulatively prejudicial; (3) there is insufficient evidence to support the trial court's order that she submit to an HIV test; (4) one of the two $300 fines imposed under section 290.3 is unauthorized; (5) the abstract of judgment should be amended by striking the 10-years-to-life sentences listed for counts 5–8; (6) the $129.75 criminal justice administration fee should be vacated in light of Assembly Bill No. 1869 (2019-2020 Reg.

15

Sess.) (Assembly Bill 1869); (7) the matter should be remanded for resentencing due to recent changes to section 654 made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518); and (8) recent changes to section 1170 made by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567).

Garcia separately argues: (1) the prosecutor improperly stated in rebuttal that Garcia had failed to create a reasonable doubt and mischaracterized the reasonable doubt standard; (2) the alleged errors were cumulatively prejudicial; (3) the $129.75 criminal justice administration fee should be vacated in light of Assembly Bill 1869; (4) the $280 criminal conviction assessment fee should be reduced; (5) the matter should be remanded for a new sentencing hearing due to recent changes to section 654 made by Assembly Bill 518; and (6) the matter should be remanded for a new sentencing hearing due to recent changes to section 1170 made by Senate Bill 567.

We will first address Torres's and Garcia's joint claims challenging the admission of Dr. Carmichael's testimony about CSAAS and the related jury instruction. We next will consider their separate arguments concerning the admission of other evidence, the prosecutor's rebuttal argument, and cumulative error. Finally, we will turn to their various sentencing claims.

A. *CSAAS Evidence and CALCRIM 1193*

1. Background

Pretrial, the prosecutor moved in limine to admit CSAAS evidence. The prosecutor noted that A. had "delayed disclosure for at least 4 months" and asserted that the CSAAS evidence was relevant and probative. The prosecutor stated that an expert witness could explain CSAAS "to provide the jurors a better understanding why victims of child sexual abuse may be fearful and reluctant in disclosing sexual abuse and how that fear and reluctance may cause delay in reporting such abuse. The expert will also be able to assist the jury to understand how such abuse may lead to an environment of

16

secrecy, helplessness, entrapment and accommodation, and retraction. The expert will explain how such abuse affects how a child discloses such abuse."

At a pretrial hearing, Garcia's defense counsel (joined by Torres's counsel) argued there was no "significant delayed disclosure . . . attributable to any kind of accommodation on the part of the victim" and no indication that A. feared either Garcia or Torres. Torres's defense counsel added that CSAAS was "outdated," in that it arose "when people had certain beliefs about how a child victim should act."

The trial court granted the prosecutor's motion, ruling that the CSAAS evidence was generally relevant and, "subject to relevance objections and there being some connection to the allegations in this case, it is admissible to explain things like delayed disclosure to the jury." The court advised defense counsel to raise any necessary objection during the expert's testimony.

At trial, Dr. Blake Carmichael testified as an expert on CSAAS. He explained that CSAAS was fashioned in the early 1980s to help educate people, explain the misconceptions and context in which child sexual abuse can occur, and lay a foundation for understanding "how something like this could occur," including the reactions of the abused child or an involved adult "that might not make sense otherwise, but we know these things do happen when kids have been sexually abused." Dr. Carmichael was not aware of the circumstances or the charges in this case and said that CSAAS is not used to diagnose children or determine whether they are telling the truth about sexual abuse. He further said that there is "no checklist," "interview," or "method to determine whether or not a child was sexually abused."

Dr. Carmichael described the five "topics" included in CSAAS, namely, secrecy, helplessness, entrapment or accommodation, delayed and unconvincing or inconsistent disclosure, and recantation or retraction.

Regarding delayed and unconvincing or inconsistent disclosure, Dr. Carmichael said that "what we know from decades of research is that most kids don't tell right

17

away." He said further that around 20 percent or less of children tell "quickly," within the first week or two, while 40 to 60 percent do not tell within the first year. When children disclose, it can be unconvincing because they often do not give consistent details, do not give the information the same way each time, or might tell different details to different people based on what they are comfortable telling each person or the context of the conversation. A common misconception regarding unconvincing disclosures is that a child will cry or be overly emotional when disclosing abuse. Rather, research done with sexually abused children showed that "about 80 percent of those kids were very flat. . . . They didn't appear tearful. They didn't cry." Furthermore, children (especially younger children) might not have "the language base or experience" to describe certain acts or body parts in a clear, non-confusing manner.

Over defense objections, Dr. Carmichael addressed some hypothetical questions posed by the prosecutor. The first hypothetical described a delayed disclosure under circumstances akin to those in this case, including that the child had previously been informed by her mother about proper and improper touching, was not threatened by the abuser, and was scared to disclose the abuse because her mother would get mad. Dr. Carmichael said that the child's behavior in this hypothetical scenario was not surprising to him because the child might feel responsible for the abuse and fear getting in trouble for being a part of it. Dr. Carmichael further explained that "touch is a very natural part of relationships" and a child might not recognize when touching becomes inappropriate. He summed up by saying, "So there's a lot of reasons why younger kids may not tell about being touched inappropriately or even be unaware of it."

Another of the prosecutor's hypothetical questions addressed incremental disclosure, presenting a scenario in which a sexual abuse victim discloses information to a parent about abuse by one person and, the next day, states further that another person also was involved in the abuse. Dr. Carmichael testified that he would not be surprised by this scenario because "it may not be relevant to that child to share about a different

18

abuse or a different situation." When the prosecutor followed up with a hypothetical in which the child had been molested simultaneously by two people but initially disclosed information about only one molester, Dr. Carmichael explained that "there are core details and peripheral details," and the fact that the touching happened (i.e., a core detail) "is maintained or maybe shared first."

The prosecutor asked Dr. Carmichael if he would be surprised if a child claimed "they were touched with a hand and then also touched with a penis, but they initially disclosed that they were just touched with the hand by one perpetrator. They don't disclose the penetration part initially." Dr. Carmichael said he would not be surprised by this situation because most people do not go fully into the "salacious" or "most traumatic details" of a disturbing event when they first talk about the event. "It's not expect[ed that] someone [would] divulge everything all at once."

Additionally, Dr. Carmichael said he would not be surprised that a child would willingly go back to an abusive caretaker for a second or third time after abuse because children rely on adults for care and protection and "might not be able to avoid going to [the abuser] because they're told they have to go." He further testified that the child might enjoy certain aspects of the relationship with the caretaker or the caretaking environment.

In objecting to the prosecutor's hypothetical questions, Garcia's counsel and Torres's counsel cited *People v. Jeff* (1988) 204 Cal.App.3d 309 (*Jeff*) and argued that the case-specific hypotheticals could not properly be used for the "purpose of proving that a molest occurred" and were being used here "to support the allegations of the molest." Garcia's counsel stated that the defense objection was limited to the use of hypotheticals, not the expert's testimony more generally. The trial court overruled the defense objection, stating that the use of hypotheticals generally is proper.

Furthermore, Garcia's counsel and Torres's counsel said they had no objection to the trial court instructing the juries regarding their consideration of the CSAAS evidence

19

and, more generally, the expert witness testimony. But Garcia's counsel said he did not "think that will cure the problem," while acknowledging "it's a step in the right direction."

During Dr. Carmichael's direct testimony, the court instructed the juries with a version of CALCRIM 1193 and with CALCRIM No. 332 (regarding expert witness testimony). The court repeated these instructions when finally (and separately) instructing the juries after the close of evidence. The final instruction with CALCRIM 1193 read as follows: "You have heard testimony from Dr. Blake [Carmichael] regarding child sexual abuse accommodation syndrome. [¶] Dr. [Carmichael]'s testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against [him/her]. [¶] You may consider this evidence only in deciding whether or not [A.] Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

In separate closing argument to each jury, the prosecutor made numerous references to Dr. Carmichael's testimony.

### 2. Challenge to CSAAS Expert Testimony

In the first of three claims challenging the CSAAS evidence and CALCRIM 1193, Torres contends the trial court erred by admitting Dr. Carmichael's testimony. She asserts the CSAAS evidence was not probative and was unduly prejudicial. She argues that while the evidence is intended to address misconceptions the jurors might have had, nothing in the record establishes whether people today still hold such misconceptions. She also asserts that the evidence was "likely more misleading than helpful," raises "grave concerns" regarding its scientific validity and underlying assumptions, and was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), because "[A.]'s credibility was paramount," Dr. Carmichael "effectively told the jury that Torres molested" A., and the prosecutor relied heavily on the CSAAS evidence in her closing

20

argument. In addition, Torres contends generally that CSAAS intrudes on the jury's determination of witness credibility, is not probative of abuse, and does not assist the jury in determining whether allegations of abuse are true. Lastly, Torres claims that the admission of CSAAS evidence violated her due process right to a fair trial. Garcia joins Torres's argument in full.

Expert witness testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), and is "[b]ased on matter (including [the expert witness's] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the witness's] testimony relates." (*Id*., subd. (b).) We review a trial court's decision to admit expert testimony for abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

As Torres acknowledges, CSAAS evidence is routinely admitted in sexual abuse cases in California. "Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.)

In light of this precedent, we conclude the trial court here did not abuse its discretion when it ruled pretrial that the prosecution's proposed expert testimony on

CSAAS was relevant and admissible.  (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 172, *Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Because we discern no error by the trial court in admitting Dr. Carmichael's testimony about CSAAS generally, we need not address Torres's related argument that that testimony was prejudicial under *Watson*.[11]  Moreover, we decide that Dr. Carmichael's testimony about CSAAS did not violate Torres's or Garcia's constitutional right to due process.  (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 174; *Patino*, *supra*, 26 Cal.App.4th at pp. 1746–1747.)

### 3.  Challenge to Case-Specific Hypothetical Questions

Garcia and Torres each contend that the trial court erred by allowing Dr. Carmichael to opine on the hypothetical questions posed by the prosecutor.[12]  Garcia argues that the hypotheticals exceeded the proper scope of CSAAS expert testimony, violated Garcia's constitutional right to be convicted based on reliable evidence, and was prejudicial under any standard of prejudice.  Similarly, Torres argues that even if the CSAAS evidence was generally admissible, the hypothetical questions and Dr. Carmichael's responses were not admissible, violated Torres's constitutional right to a fair trial, and were prejudicial regardless of the applicable harmlessness standard.  As they did in the trial court, Garcia and Torres rely in part on *Jeff*, *supra*, 204 Cal.App.3d 309 as support for their arguments.

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' " (*People v.*

---

[11] Neither Torres's defense counsel nor Garcia's defense counsel argued at trial that the trial court should preclude Dr. Carmichael's testimony under Evidence Code section 352.  We do not understand Torres's argument on appeal regarding the prejudice resulting from the purportedly erroneous admission of Dr. Carmichael's testimony to include a separate claim that the prosecutor committed error when discussing the CSAAS evidence in her closing arguments.

[12] In her briefing, Torres also joins Garcia's argument on this claim.

*Vang* (2011) 52 Cal.4th 1038, 1045; see also *People v. Sanchez* (2011) 63 Cal.4th 665, 676–677.) On the other hand, it is improper for an expert to testify about CSAAS in a manner that directly coincides with the facts of the case. (See *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099–1100.) A trial court has broad discretion with respect to the admission of expert testimony, and we review a trial court's rulings for abuse of discretion. (See *People v. Duong* (2020) 10 Cal.5th 36, 60; *People v. Moore* (2011) 51 Cal.4th 386, 419 (conc. opn. of Kennard, J.).)

In *Jeff*, two experts for the prosecution testified: The first described the victim's symptoms based on interviews with the victim, and the second described child molest syndrome. The prosecution prefaced the expert testimony in opening statement by saying that the second expert would tell the jury " 'what these symptoms mean.' " (*Jeff*, *supra*, 204 Cal.App.3d at p. 338.) The prosecution ultimately asked the second expert a series of hypothetical questions that incorporated "the exact same facts and details" as those in the allegations against the defendant. (*Ibid.*) The expert explained that the victim's "emotions, fears, and reactions to others are symptoms exhibited by a child molest victim." (*Ibid.*) On appeal, the *Jeff* court held this evidence was inadmissible because the expert's testimony "told the jury that they should accept" as true the victim's version of events. (*Ibid.*)

The expert testimony presented in this case is distinguishable from that in *Jeff*. The prosecution did not present any expert testimony based on interviews or examinations of A. In fact, Dr. Carmichael testified that he did not know any circumstances of the present case. Although the prosecutor's hypothetical questions bore similarities to A.'s behavior as established by prosecution evidence, neither the questions nor Dr. Carmichael's responses tracked A.'s conduct so closely that the testimony "told the jury" it should believe her allegations. (*Jeff*, *supra*, 204 Cal.App.3d at p. 338.) By contrast, Dr. Carmichael testified specifically that CSAAS is "absolutely not" used to

23

diagnose children or determine whether they are telling the truth about sexual abuse. He further said, "There's no method to determine whether or not a child was sexually abused." Additionally, the trial court instructed the juries on the limited permissible use of Dr. Carmichael's testimony. We presume the juries here understood and followed these instructions. (See *People v. Hinton* (2006) 37 Cal.4th 839, 871.)

Under these circumstances, we are not persuaded that the prosecutor's hypothetical questions and Dr. Carmichael's responses were impermissible under *Jeff* or any other binding precedent. We thus conclude that the trial court did not abuse its discretion by allowing Dr. Carmichael to opine in response to the hypothetical questions. Given our conclusion that this testimony was properly admitted, we further decide that there was no violation of Garcia's or Torres's constitutional rights. (See *People v. Jones* (2013) 57 Cal.4th 899, 949; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

### 4. Challenge to CALCRIM 1193

Garcia and Torres each contend that the trial court erred by instructing with CALCRIM 1193.[13] Garcia acknowledges that his defense counsel failed to object to this instruction and described it as a "step in the right direction." Nevertheless, Garcia urges us to address the merits of his appellate claim based on several exceptions to forfeiture and argues alternatively that we should consider the merits of his challenge under the rubric of ineffective assistance of counsel. As for CALCRIM 1193 itself, Garcia contends that the instruction misstates California law by effectively allowing the jurors to consider the CSAAS evidence as circumstantial proof of molestation. He argues further that CALCRIM 1193 violated his constitutional rights to a jury trial and due process. Lastly, he asserts that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) and *Watson*.

---

[13] In her briefing, Torres also joins Garcia's argument on this claim.

Torres similarly acknowledges that her defense counsel did not object to the trial court instructing her jury with CALCRIM 1193. She argues, however, that we should consider her challenge to CALCRIM 1193 based on exceptions to forfeiture and, alternatively, because her counsel was ineffective for failing to object. Regarding the merits of her challenge to CALCRIM 1193, Torres claims that the instruction improperly allowed her jury to consider the "CSAAS evidence to diagnose or profile [A.] as a molestation victim," misled the jury by allowing it to use the evidence when considering A.'s believability, and "offer[ed] only the option to find [A.]'s conduct consistent with that of a molestation victim." Torres also contends the flawed instruction was not otherwise cured by any other instruction. Lastly, Torres argues that CALCRIM 1193 violated her constitutional rights to a jury trial and due process, and the error was not harmless under *Chapman* or *Watson*.

The Attorney General counters that Garcia and Torres forfeited their appellate claims by failing to object to CALCRIM 1193 at trial, their defense counsel were not constitutionally ineffective, and there was no violation of Garcia's or Torres's constitutional rights.

Regarding forfeiture, we decide that we can consider the merits of Garcia's and Torres's claims despite their failure to object at trial because they contend the challenged instruction was an incorrect statement of law and affected their substantial rights under section 1259.[14] (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60.)

Turning to the merits of the challenge to CALCRIM 1193, "[w]e review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' "

---

[14] Because we will address the merits of the challenge to CALCRIM 1193, we need not address the alternative ineffective assistance of counsel claims.

25

(*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

As Garcia and Torres acknowledge, California courts have upheld CALCRIM 1193 as accurately informing jurors about the limited use of CSAAS evidence and have rejected various attacks on the instruction's propriety. (See *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176 [citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 & *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474].) Nevertheless, Garcia and Torres argue that those decisions did not fully address the alleged flaws in CALCRIM 1193, specifically the language in the third sentence of the instruction concerning the victim's conduct being " 'not inconsistent with' " that of a molestation victim.[15]

We are not persuaded by Garcia's and Torres's arguments that the existing precedent falls short in analyzing the correctness of CALCRIM 1193. We also disagree with Garcia's and Torres's reading of the third sentence of the instruction. As a matter of logic, that particular conduct by an alleged victim is not inconsistent with having been a victim of sexual abuse and does not necessarily mean the alleged victim's conduct is inevitably consistent with such victimization.

Furthermore, assessing the instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the juries here applied the instruction in an impermissible manner. CALCRIM 1193 told the jurors that the CSAAS evidence could not be considered as evidence that Garcia and Torres "committed any of the crimes charged against [them]." Thus, the instruction explicitly precluded the use of the CSAAS evidence to conclude inferentially from A.'s conduct and Dr. Carmichael's testimony that

---

[15] That sentence reads: "You may consider this evidence only in deciding whether or not [A.] Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

26

Garcia and Torres committed the charged crimes. Relatedly, Dr. Carmichael testified that CSAAS was not a test to determine the truth of a sexual abuse allegation. In addition, as discussed, the third sentence of the instruction did not compel a conclusion that A.'s conduct was consistent with being a victim. Moreover, we are not convinced that the prosecutor's comments in closing argument would have caused the juries to consider the CSAAS in a manner contrary to the trial court's instruction. The court instructed the jurors (with CALCRIM No. 200) that they "must follow the law" as the court explained it, and if the jurors "believe[d] the attorneys' comments on the law conflict with [the court's] instructions, [the jurors] must follow [the court's] instructions."

We acknowledge there is a fine line between the impermissible use of CSAAS testimony to determine guilt and the permissible use of the evidence to evaluate a victim's credibility as described in CALCRIM 1193, but California courts have upheld this distinction. We decline to depart from that precedent under the present circumstances. In sum, we conclude that the trial court properly instructed the juries with CALCRIM 1193, and Garcia's and Torres's constitutional rights were not violated by that instruction.

B. *Testimony that Torres " 'Liked It' "*

Maria testified that A. said she had told Torres to stop touching her. But Torres "didn't want to" stop. When Maria asked A., " 'Why didn't [Torres] stop? What do you mean?' " A. responded " 'because [Torres] liked it.' " Maria replied by saying something like " 'Okay. We're just -- we're gonna go to sleep.' [¶] And I just -- I was, like --"

At that point, Torres's defense counsel interrupted Maria's testimony saying, "Your honor, I want to ask the latter part of the previous answer be stricken. It's speculation." The trial court responded, "It will be accepted not for the truth of what was said but just to explain the conduct of the witness."

27

The prosecutor next asked if Maria had tried to clarify with A. if Torres had touched her when " 'wiping' " her in the bath "or anything like that." Maria responded, "I asked [A.] . . . 'Did she shower you or did she clean you?' [¶] And [A.] said, 'No, [Torres] . . . touched me because she liked it.' " Torres's defense counsel objected saying, "Again, same objection." The trial court responded, "Ladies and Gentlemen, the last part of that answer about 'she liked it' is being admitted not for the truth of the words that were said, but just to explain what the witness then did after that. You are not to accept it for the truth of the matter, just to explain the witness's subsequent conduct."[16]

On appeal, Torres contends that the trial court abused its discretion by not excluding the " 'she liked it' " statements entirely. She argues that the statements were A.'s inadmissible lay opinion about Torres's state of mind and were prejudicial under *Watson* with regard to the four lewd or lascivious act convictions (§ 288, subd. (b)(1); counts 5–8).

An out-of-court statement admitted to show its effect on the listener is "not hearsay because it [is] not admitted for [its] truth." (*People v. Jablonski* (2006) 37 Cal.4th 774, 820; see also Evid. Code, § 1200, subd. (a).) Nonetheless, the nonhearsay purpose of the statement must be relevant to an issue in dispute. (*Jablonski*, at pp. 820–821; see also Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)

---

[16] Relatedly, after the close of evidence, the trial court instructed Torres's jury as follows: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

We discern no abuse of discretion in the trial court's rulings to allow the jurors to hear Maria's testimony about A.'s description of Torres's behavior. In defending against the charges, Torres disputed the circumstances of the interaction between Maria and A. at the time of the disclosure and further challenged Maria's credibility. In her pretrial in limine motion, Torres asserted that "[A.] may have been influenced by her mother's questioning." At trial, and in the same vein, Torres asserted that Maria aggressively questioned A. when she first disclosed the abuse, was, at that time, "thinking about what happened to her[self] when she was young," "obviously ha[d] concluded that [Torres] and [Garcia] ha[d] harmed [A.]," and testified "with her mind set already." Further, Torres's defense counsel urged the jurors to "keep [Maria's mentality] in mind as you think about her testimony, and how that may have influenced [A.]"

Given the disputed nature and centrality of A.'s initial disclosure, Maria's role in that disclosure, and Maria's credibility, the trial court acted properly when it overruled Torres's objections, rejected her request to strike the " 'because she liked it' " statements, and limited the jury's consideration of those statements. The statements provided relevant context for the conversation between Maria and A. and had probative value on the issue of why Maria would act the way she did in the face of A.'s answers and whether Maria was a believable witness. The statements informed the jury's analysis of Maria's conduct both during the disclosure itself and later when she contacted the police about what A. had told her. Further, by limiting the jury's use of the statements to an assessment of Maria's subsequent conduct, the trial court's ruling rendered immaterial Torres's current assertion that the statements are inadmissible lay opinion testimony under Evidence Code section 800. Under these circumstances, we conclude the trial court acted within its discretion when admitting the challenged statements for a limited purpose.

29

C. *Prosecutor's Rebuttal Argument on Reasonable Doubt*

Garcia contends that in rebuttal argument to his jury, the prosecutor improperly argued that he failed to create a reasonable doubt ("burden-shifting" claim) and mischaracterized the reasonable doubt standard by suggesting it could be satisfied by a reasonable account of the evidence ("mischaracterization" claim). Garcia asserts the prosecutor's errors violated California state law and his constitutional right to due process. He claims further that the errors were prejudicial under any applicable standard, because the prosecution's case was not overwhelming and the prosecutor repeatedly misstated the law just before jury deliberation.[17]

The Attorney General responds that Garcia forfeited his claims by failing to object at trial and, regardless, his claims lack merit because the prosecutor did not misstate or diminish the reasonable doubt standard.

1. Background

Immediately preceding closing arguments, the trial court instructed Garcia's jury with the standard instructions on reasonable doubt (CALCRIM No. 220), circumstantial evidence (CALCRIM No. 224), and adherence to the law as explained by the court (CALCRIM No. 200).[18] The court also reiterated the People's burden to prove Garcia's guilt beyond a reasonable doubt when providing other jury instructions.

---

[17] We do not understand Torres's statement of joinder in "all other issues and arguments applicable to her that are raised in the briefs of co-appellant Garcia" as including this particular claim of error. Torres's and Garcia's juries heard separate closing arguments, and Torres made no argument regarding this issue in her briefing.

[18] The reasonable doubt instruction read in part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence

During her initial closing argument, the prosecutor argued that the prosecution had proven its case beyond a reasonable doubt on all counts.

In response, Garcia's defense counsel challenged the reliability of A.'s testimony, argued that the CSAAS evidence was insignificant, noted that Dr. Malinek said Garcia was not a pedophile, and asserted that Garcia's statement to police was consistent with other evidence, including A.'s preliminary hearing testimony. Counsel discussed the prosecution's burden of proof and argued that only one count of the lesser included offense of lewd or lascivious act under section 288, subdivision (a), had been proved beyond a reasonable doubt. Alternatively, counsel argued that if the jurors believed duress had been proved, then they should find Garcia guilty of a single count of violating the greater offense charged under section 288, subdivision (b)(1). Counsel urged the jurors to return not guilty verdicts on the remaining counts and said "this is one of those cases that turns on reasonable doubt, where reasonable doubt is really important, reasonable doubt matters more than anything else in the world."

In rebuttal, the prosecutor began by saying, "Now is my opportunity to discuss the defense in this case and explain to you why they have not created reasonable doubt. [¶] First, I'm going to talk about the red herring in this case and then I'm going to address the defense['s] arguments to the People's case and why they did not create reasonable doubt." The prosecutor then read a portion of the trial court's reasonable doubt instruction, including that "[t]he evidence need not eliminate all possible doubt because

that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM No. 220.)

The circumstantial evidence instruction told the jurors that before they could rely on circumstantial evidence to conclude a necessary fact had been proved, they had to be "convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." (CALCRIM No. 220.) The instruction stated further: "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty." (*Ibid.*)

31

everything in life is open to some possible or imaginary doubt." The prosecutor said that although it was possible that A. simply saw Garcia and Torres having sex and Garcia only touched A. one time, "possible" is "not the standard in this case. Anything is possible. [¶] What is reasonable? That is the standard in this case and it's the standard in every courtroom across America. This is not this crazy unattainable standard. What is reasonable? That's what you have to ask yourself."

The prosecutor urged the jurors not to be "thrown off by the defense's red herrings. They do not create reasonable doubt." After arguing why Dr. Malinek was the "biggest red herring," the prosecutor reiterated that she would address "the defense's arguments to the People's case and why did they [] not create reasonable doubt." The prosecutor then discussed the differences and consistencies in A.'s statements and her preliminary hearing testimony, and stated "that does not create reasonable doubt."

The prosecutor then cited a number of disputed evidentiary points and argued they do "not create reasonable doubt" and stated, "What is reasonable? There's no way that [A.] is making this up and can keep up this lie."

The prosecutor then said: "The defense did not create reasonable doubt in this case. All of their defense, sure, it's possible. That's not the standard. You saw [A.] and what she went through and what she told you. [Garcia] even admitted it, but we know from his personality test that he can't get himself there." At that point, Garcia's defense counsel objected "to the use of the term 'create reasonable doubt.'" The trial court overruled the objection. When defense counsel attempted to elaborate on his objection, the court immediately reiterated its ruling.

The prosecutor continued, stating that Garcia had admitted to touching A. in two places and the lesser included offense (under section 288, subdivision (a)) did not apply given the evidence supporting the greater offense. The prosecutor then concluded her rebuttal argument by saying: "The defense did not create reasonable doubt. And [A.] alone, her testimony alone shows that [Garcia] is guilty beyond a reasonable doubt, but

all of the other evidence -- his admission, [Torres]'s coverup, [A.]'s demeanor, the way she disclosed it -- all of that shows you that he's guilty beyond a reasonable doubt. [¶] And I ask that you hold him accountable for making her go through what no four-year-old should ever go through."

### 2. Legal Principles

The prosecution has the burden to prove the charged crimes beyond a reasonable doubt. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; *People v. Centeno* (2014) 60 Cal.4th 659, 672 (*Centeno*); § 1096.) Although a defendant may present evidence to suggest a failure of proof (see, e.g., *People v. Hendrix* (2022) 13 Cal.5th 933, 940) or to raise a reasonable doubt (see, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136), the defendant is not required to present any evidence and may simply rely on the state of the prosecution's evidence. (See *People v. Hill* (1998) 17 Cal.4th 800, 831–832 (*Hill*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The jury, "[s]etting aside the incredible and unreasonable, . . . evaluates the evidence it deems worthy of consideration. It determines just what that evidence establishes and how much confidence it has in that determination. The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Centeno*, at p. 672.)

"It is considered misconduct to misstate the law to the jury, and bad faith is not required. [Citation.] But a prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.)

"Generally, ' "[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." ' [Citation.] A failure to 'object and request an admonition will be excused if doing either would have been futile, or if an

33

admonition would not have cured the harm.' [Citation.] '[T]he absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request." ' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

" 'Prosecutorial misconduct requires reversal when it "so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury." ' " (*People v. Peterson* (2020) 10 Cal.5th 409, 464.)

Prosecutorial misconduct that violates state law is harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071; see also *Watson*, *supra*, 46 Cal.2d at p. 836.) Federal constitutional error is harmless if, beyond a reasonable doubt, the error did not affect the outcome of the trial. (*People v. Cook* (2006) 39 Cal.4th 566, 608; see also *Chapman*, *supra*, 386 U.S. at p. 24.)

"[A]n appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213; *People v. Peoples* (2016) 62 Cal.4th 718, 792–793.)

### 3. Analysis

Regarding forfeiture, Garcia acknowledges that his defense counsel objected only once (late in the rebuttal argument) to the prosecutor's statements about the defense not having created a reasonable doubt. Nevertheless, Garcia asserts that his challenge to the prosecutor's use of the alleged burden-shifting language throughout the rebuttal argument should be excepted from forfeiture because any earlier objection would have been futile given the trial court's ruling when his counsel finally objected. Under the present circumstances, we agree. Given the similarity of the prosecutor's statements throughout her rebuttal argument, we can presume the trial court would have overruled any earlier objection by Garcia's counsel. (See *People v. Zambrano* (2004) 124 Cal.App.4th 228, 237.)

Garcia similarly acknowledges that his defense counsel failed to object to the alleged mischaracterization of the reasonable doubt standard. He nonetheless urges us to address the merits of his claim because we have the discretion to do so and can eschew forfeiture to forestall a claim of ineffective assistance of counsel. Alternatively, he argues that we should consider the merits of his claim under the rubric of ineffective assistance of counsel. By contrast to Garcia's burden-shifting claim, we decide that his mischaracterization claim is forfeited by the failure to object to the prosecutor's "[w]hat is reasonable" statements and request an admonition. (See *People v. Morales* (2001) 25 Cal.4th 34, 43–44; *Centeno*, *supra*, 60 Cal.4th at p. 674.) Nevertheless, given that both parties have addressed the merits of the mischaracterization claim in their briefing, we will assume arguendo that the claim was preserved for our review and decide whether any relief is warranted.

Turning to the merits of Garcia's claims, section 1096 "expressly provides that a 'reasonable' doubt is not a mere ' "possible" ' or ' "imaginary" ' doubt." (*Centeno*, *supra*, 60 Cal.4th at p. 672.) However, "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*Ibid*.,

italics omitted.) "It is likewise error to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.] It is, and remains, the prosecutor's burden to prove the case. If the defense chooses to produce evidence, the jury must, of course, consider it as part of the complete record before it. To that end, the prosecution can surely point out that interpretations proffered by the defense are neither reasonable nor credible. Nevertheless, even if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden. The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own." (*Id*. at p. 673; see also *Hill*, *supra*, 17 Cal.4th at pp. 831–832.)

"To determine whether a prosecutor has committed reversible misconduct in this context, we examine (1) whether it was reasonably likely that the prosecutor's statements misled the jury on reasonable doubt and (2) whether there is 'a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165–1166 (*Johnsen*).)

Here, the prosecutor's statements asserting the defense had failed to create a reasonable doubt and explaining the difference between a possible doubt and a reasonable doubt are somewhat ambiguous. Additionally, the prosecutor did not clearly articulate that the burden to prove the charges beyond a reasonable doubt is always on the People and that the defense does not have to prove anything. Given the ambiguity in the prosecutor's rebuttal statements, we will assume arguendo that the statements were reasonably likely to have misled the jurors to think that the defense had a duty to establish a reasonable doubt and the prosecution's burden turned on whether its proof was reasonable.

Notwithstanding this assumption, we are not convinced that there is a reasonable probability the prosecutor's statements caused a juror to convict Garcia on a standard

36

lower than beyond a reasonable doubt. On the same day as the rebuttal argument, the trial court correctly instructed the jury on the reasonable doubt standard and directed the jury to follow the court's instructions in the event of any conflicting statements by the attorneys. We presume, absent contrary indications, that the jurors followed the instructions given by the court. (See *People v. Fayed* (2020) 9 Cal.5th 147, 192; see also *People v. Mayfield* (1993) 5 Cal.4th 142, 179.)

Further, the prosecutor's statements were principally directed at the relative weakness of the defense's evidence and argument when considered in light of the entire record, rather than expressly suggesting that the defense bore a burden to show reasonable doubt to obtain an acquittal or that the prosecution did not have to prove every element of the charged crimes beyond a reasonable doubt. Additionally, the prosecutor stated in both the initial closing argument and the rebuttal argument that the evidence proved Garcia's guilt of the charges beyond a reasonable doubt. Thus, this is not a case where the prosecutor's arguments consistently attempted to shift or reduce the People's burden of proof. Furthermore, we do not consider the case against Garcia to be a particularly close one. Although Garcia denied sexually abusing or penetrating A., he admitted touching her at Torres's urging and described A. as wanting to kiss him and touch his penis. When viewed along with A.'s statements about what transpired and the rest of the prosecution's evidence, the case against Garcia was strong.

On this record, we conclude that there is no reasonable probability the prosecutor's erroneous statements caused any jurors to convict Garcia based on a lesser standard of proof than proof beyond a reasonable doubt. (See *Johnsen*, *supra*, 10 Cal.5th at p. 1168.) Moreover, the prosecutor's statements did not infect the trial with such unfairness that Garcia's constitutional rights were violated. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1345.) Hence, we will not reverse the judgment against Garcia because of the prosecutor's statements in rebuttal argument.

D. *Cumulative Error*

Having concluded *ante* that Torres's claims challenging her convictions are without merit, we in turn reject her claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818 (*Hensley*).)

We similarly reject Garcia's claim of cumulative error and prejudice. Although we assumed error regarding the prosecutor's statements in rebuttal argument, we have determined that Garcia was not prejudiced and discerned no other error with regard to Garcia's convictions. Thus, there is no prejudicial error to cumulate for Garcia. (See *Hensley*, *supra*, 59 Cal.4th at p. 818.)

E. *Claims Related to Sentencing*

As described in the introduction to part II. of this opinion, *ante*, Torres and Garcia raise multiple claims on appeal related to their sentencings. We will address their requests (set forth in supplemental briefing) for remand based on recent changes to section 654 made by Assembly Bill 518. Because we decide that a remand for full resentencing under current section 654 is appropriate for both Garcia and Torres, we do not address Garcia's or Torres's other sentencing claims. Garcia and Torres may raise any of their remaining sentencing claims in the trial court during resentencing, including any issues regarding the applicability of Senate Bill 567 and Assembly Bill 1869, the trial court's order requiring Torres to submit to an HIV test, and the imposition of fines, fees, or assessments.

Furthermore, because we vacate both Garcia's and Torres's sentence, we will not order any correction to the abstracts of judgment or clerk's sentencing minutes, although we agree with the parties that there are a number of errors in those documents. On remand, the trial court will generate new abstracts of judgment and minute orders based on its resentencing and will exercise its usual prerogative to ensure that the abstract of

judgment and sentencing minutes comport with the sentence pronounced. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

1. Background

During the jury instruction conference, the trial court explained its understanding that the prosecution had decided to charge counts 5 through 8 (§ 288, subd. (b)(1)) as "alternative," "lesser-related offenses" for the acts charged in counts 1 and 2 (§ 288.7, subd. (a) [sexual intercourse or sodomy]) and counts 3 and 4 (§ 288.7, subd. (b) [oral copulation or sexual penetration]). None of the parties disputed this summary. Further, the parties and the court agreed that both juries would be instructed on lesser included offenses for counts 5 through 8 but no lesser included offenses would be provided to the juries for counts 1 through 4.

The trial court instructed both juries on lesser offenses only as to the crimes charged in counts 5 through 8. The court did not provide either jury any instruction regarding the "alternative" nature of counts 1 through 4 and counts 5 through 8, and the verdict forms permitted the juries to return verdicts on all of the counts. In addition, the court's instructions for counts 1 and 2 told the jurors that the People had to prove "[t]he defendant engaged in an act of sexual intercourse with [A.] Doe." Similarly, the instructions for counts 3 and 4 told the jurors that the People had to prove "[t]he defendant engaged in an act of oral copulation or sexual penetration with [A.] Doe." Neither these instructions nor the related verdict forms specified what particular act committed by Garcia and/or Torres had to be proved by the prosecution to satisfy counts 1 through 4. Likewise, the instructions and verdict forms for counts 5 through 8 did not specify the relevant lewd or lascivious act that had to be proved by the prosecution.

During closing argument to Garcia's jury, the prosecutor argued that Garcia was guilty of counts 1 through 4 and then stated that, for counts 5 through 8, if the jurors "find that something happened, there was touching, but if you don't find that it rises to the level of legal penetration, then you can find [Garcia] not guilty of counts 1 through 4 and still

39

find him guilty of counts 5 through 8. Or if you find there is a legal penetration by a penis, oral copulation, and digital penetration, he's also guilty of touching and molesting, because naturally, if you are having a four-year-old hump your penis, you're also guilty of counts 5 through 8."

Similarly, during closing argument to Torres's jury, the prosecutor argued that Torres was guilty of counts 1 through 4 and said that counts 5 through 8 involved sexual touching without any requirement of penetration. The prosecutor further explained that if the jurors "think [Torres] is guilty of count 1 through 4, the legal penetration, sexual penetration, digital penetration and oral cop[ulation], she's also guilty of counts 5 through 8, because the penetration is also a sexual touching. Guilty of counts 1 through 4, also guilty of counts 5 through 8 automatically. But if you think that there's no penetration but you think that there is a sexual touching or oral copulation then she could be not guilty of counts 1 and 4, and still be guilty of counts 5 through 8, and that's because you just didn't think there was a legal penetration. And again, that it has to be oral copulation or touching for a sexual purpose. And again, we know it happened twice. Once in the apartment; once in the RV. And there's different things going on. It's legal penetration, digital penetration, copulation and legal penetration in both places. She is guilty of counts 5 through 8."

As discussed *ante* (see part II.C.1.), Garcia's defense counsel urged the jury to find Garcia guilty of only one count for counts 5 through 8 and not guilty on all remaining counts.

Torres's defense counsel urged Torres's jury to "say not guilty on the penetration" and contended that there was no evidence of sexual arousal as to Torres having put Desitin cream on A. Counsel also asserted that if the jurors felt Torres "went out of bounds by putting Desitin on [A.], then hold her accountable for the battery, which is one of the less[e]rs that you have been instructed [on], but she did not molest [A.] All she did was put [on] cream."

40

Garcia's jury found him guilty on all counts. Torres's jury found her guilty on count 1 and counts 3 through 8. The jury failed to reach a unanimous verdict on count 2 (one of the two sexual intercourse counts), and the trial court dismissed it. Neither Garcia nor Torres has claimed (either at trial or on appeal) that their convictions on counts 5 through 8 are improper multiple convictions under section 954. (See *People v. Aguayo* (2022) 13 Cal.5th 974, 981–982; see also *People v. White* (2017) 2 Cal.5th 349, 355.)

At Garcia's December 2018 sentencing, defense counsel stated that he had "explained to Mr. Garcia that consecutive sentencing is mandatory on Counts One through Four." The trial court did not correct this statement.[19] Counsel also said that he agreed with the probation officer's report that the punishments on counts 5 through 8 should be stayed pursuant to section 654.[20]

In accord with the probation officer's recommendation, the trial court imposed on Garcia a total sentence of 80 years to life comprising consecutive terms of 25 years to life on counts 1 and 2 (§ 288.7, subd. (a)), plus consecutive terms of 15 years to life on counts 3 and 4 (§ 288.7, subd. (b)). The court also imposed stayed terms of 10 years on each of counts 5 through 8 (§ 288, subd. (b)(1)), pursuant to section 654. The trial court did not

---

[19] Counts 1 through 4 (charged under section 288.7, subdivisions (a) and (b)) are not offenses specified in subdivision (e) of section 667.6, for which mandatory consecutive sentencing is required.

[20] The probation officer's report for Garcia stated the following: "[W]hile noting Counts Five, Six, Seven and Eight (violent sex crimes requiring consecutive sentencing pursuant to Section 667.6[, subdivision] (d) []) were filed as alternate Counts as to Counts One, Two, Three, and Four, punishments in the former Counts are recommended stayed pursuant to Section 654 of the Penal Code." The probation report also said: "In view of the case being aggravated, as the conduct was committed against a young vulnerable victim, and involved behavior where force was used, with the assaults having occurred on multiple dates, it is recommended Counts One, Two, Three, and Four be consecutive to one another, for a total indeterminate term of 80 years to life."

state any reasons for imposing the consecutive sentences on counts 1 through 4 or the upper term of 10 years on counts 5 through 8.

At Torres's December 2018 sentencing, a probation department representative acknowledged that, contrary to a statement in the probation officer's report, the fact that the "assaults [against A.] occurred on multiple dates [] is actually not an aggravator . . . just a reason to go consecutive." The representative also stated that the listed aggravating factor noting "force" as an element of the offense "should be deleted [from the probation report] as well."[21] Furthermore, the representative explained: "So the [section] 288.7[, subdivision] (a) and [subdivision] (b) counts are not specifically listed under [section] 667.6. But based on the alternate charges of Counts Five, Seven, and Eight being listed, it appears that those counts could be sentenced pursuant to [section] 667.6. [¶] However, to stay on the safe side, I would recommend that they all be sentenced, including Count Six, all be sentenced under [section] 1170."

---

[21] Torres's probation report stated the following: "[W]hile noting Counts Five, Seven and Eight were filed as alternate Counts as to Counts One, Three, and Four, punishments in the former Counts are recommended stayed pursuant to Section 654 of the Penal Code. In view of the case being aggravated due to the vulnerability of the victim, that the assaults occurred on multiple dates, and with behavior that involved force, the aggravated term of 10 years is selected as to Count Six. It is further recommended the indeterminate term of 25 years to life as to Count One be consecutive to Count Six, along with Counts Three and Four (each 15 years to life) also consecutive, in view of the above, for a total term of 55 years to life consecutive to 10 years. Should the Court decide to impose a different sentence, it is noted Count Six is a violent sex offense, and pursuant to Section 667.6[, subdivision] (d) of the Penal Code, the term (10 years) 'shall be served consecutively to any other term of imprisonment' and additionally, 'any other term imposed subsequent to that term (10 years) shall not be merged.' " Additionally, in a list of circumstances in aggravation attached to the probation report, the probation officer further noted that Torres took advantage of a position of trust or confidence to commit the offense (Cal. Rules of Court, rule 4.421(a)(11)) and that Torres's "prior convictions . . . are numerous or of increasing seriousness." (*Id.*, rule 4.421(b)(2).) However, the probation report also stated that Torres had no prior felony convictions and only one prior misdemeanor conviction for petty theft in 2004.

Torres's defense counsel asserted that section 654 applied to counts 5 through 8, "given how the case was charged and argued," as well as to counts 3 and 4 (relative to count 1), "given the lack of specific findings or anything like that with regards to what occurred." Counsel summed up his position by saying "it's 25 to life [on count 1] and everything else is either [section] 654 or concurrent." The prosecutor responded, "The jury did find [Torres] guilty of all of the lessers [(i.e., counts 5 through 8)]. So she could be sentenced consecutively as to one of them, which would replace Count Two" (on which the jury could not reach a unanimous verdict and which had been dismissed at the district attorney's request).

The trial court said "the jury was instructed [] that Counts Five, Six, Seven, and Eight were lesser offenses to Counts One, Two, Three and Four . . . . And so I do think Count Six is a lesser offense."[22] After holding an unreported bench conference, the court stated further: "The jury was instructed with regard to the lessers, the charge of lessers. Given that the jury did not acquit [Torres] of the greater in Count Two, I think it was more appropriate to assume that the charge of Count Six was [section] 654 with regard to Counts One, Three and Four."

The court imposed on Torres a total sentence of 55 years to life comprising 25 years to life on count 1 (§ 288.7, subd. (a)), plus consecutive terms of 15 years to life on counts 3 and 4 (§ 288.7, subd. (b)). The court also imposed stayed terms of 10 years on each of counts 5 through 8 (§ 288, subd. (b)(1)), pursuant to section 654. The trial court did not state any reasons for imposing the consecutive sentences on counts 1, 3, and 4 or the upper term of 10 years on counts 5 through 8.

---

[22] This statement by the trial court does not accurately reflect the jury instructions. As discussed above, although counts 5 through 8 were deemed "alternative," lesser related offenses to counts 1 through 4, the trial court only instructed Torres's jury on lesser offenses for counts 5 through 8, not for counts 1 through 4.

On appeal, the Attorney General raises (for the first time in his supplemental respondent's brief) a "problem" with Torres's sentencing. The Attorney General contends "the court imposed and stayed four terms under Penal Code section 654, when it should have imposed and stayed only three of them because Torres was being doubly punished on only three rather than on four of the [c]ounts. Under the sentencing as it currently exists, Torres is not being punished at all for one of the [c]ounts of forcible lewd and lascivious conduct." Torres has not addressed this issue in her briefing.

### 2. Analysis

As described above, there appear to have been a number of misconceptions held by the parties and/or the trial court at the sentencings for both Garcia and Torres. For example, Garcia's counsel stated that counts 1 through 4 were required to be sentenced consecutively, the probation reports included uncorrected errors regarding aggravation, and the trial court described counts 5 through 8 as having been presented to the jury as "lesser offenses" to counts 1 through 4. Nevertheless, for the reasons stated below, we conclude that both Garcia and Torres must be resentenced in full. Therefore any errors in the previous sentencings can be remedied at resentencing.

Effective January 1, 2022, section 654 was amended by Assembly Bill 518. (Stats. 2021, ch. 441, § 1.) As amended, section 654, subdivision (a), provides in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose the term that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).)

The Attorney General concedes that the recent legislative changes to sections 654 apply to Garcia and Torres because their judgments are not yet final. We agree. (See

44

*People v. Mani* (2022) 74 Cal.App.5th 343, 379; *People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

Regarding Garcia's request for a remand for resentencing under current section 654, the Attorney General argues that remand is not necessary because "[t]here is simply no reasonable basis for the court to have exercised discretion to impose sentence on Counts 5 through 8 and stay the terms on Counts 1 through 4, when Garcia's conduct far exceeded what would be required for a forcible lewd touching."

Regarding Torres's request for a remand under current section 654, the Attorney General states no position. Instead, the Attorney General notes his unrelated position that Torres's case should be remanded for resentencing because the trial court committed an error by imposing two fines under section 290.3. The Attorney General also sets out the potential error in failing to impose any sentence on Torres for one of the lewd act convictions caused by the trial court having stayed all punishment on counts 5 through 8.

At the time the trial court sentenced Garcia and Torres, it had no discretion to choose which counts to stay under section 654. (§ 654, former subd. (a).) Generally, when a change in the law confers previously unavailable discretion on a trial court, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. Jones* (2019) 32 Cal.App.5th 267, 273; *People v. McVey* (2018) 24 Cal.App.5th 405, 418.) We review the sentencing court's statements and sentencing decisions to infer what its intent would have been. (*Jones*, at p. 273.)

Under the present circumstances, we decide that a remand for resentencing is proper for both Garcia and Torres. Although the probation reports noted a few circumstances in aggravation for Garcia and Torres, the trial court did not detail any specific aggravating circumstances supporting its imposition of the upper term on counts 5 through 8. Likewise, the court did not provide any explanation for its imposition of

45

consecutive sentences on counts 1 through 4 for Garcia or on counts 1, 3, and 4 for Torres.

It is, of course, understandable that the trial court gave no indication of how it would exercise its discretion under current section 654, which had not yet been enacted. Although the court's imposition of consecutive and upper term sentences for Garcia and Torres provides some indication that the trial court might choose to exercise its newly conferred discretion under section 654 by electing to stay the counts with the shorter terms of imprisonment, the sparse record here does not clearly indicate that the court would take that approach at a resentencing.

Accordingly, we agree with Garcia and Torres that remand is appropriate so the trial court may fully resentence each of them anew under the new law. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) At resentencing the trial court will have the opportunity to exercise its discretion to apply current section 654. In addition, the People may raise any argument regarding the impropriety of staying the punishment for all of Torres's convictions on counts 5 through 8. We express no opinion on how the court should exercise its sentencing discretion.

Furthermore, upon remand the trial court may revisit all its prior sentencing decisions, including the application of section 1170, subdivision (b), as amended by Senate Bill 567. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425; *People v. Jones* (2022) 79 Cal.App.5th 37, 46.)

Garcia and Torres may raise in the trial court their arguments challenging their sentences which this court has not addressed in light of its decision to vacate their sentences.

### III. DISPOSITION

The judgment against Garcia is reversed, his sentence is vacated, and the matter is remanded to the trial court solely for resentencing under current law and consistent with this opinion. Garcia's convictions are affirmed.

46

The judgment against Torres is reversed, her sentence is vacated, and the matter is remanded to the trial court solely for resentencing under current law and consistent with this opinion. Torres's convictions are affirmed.

_____
                                      Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Lie, J.

**H046635**
*People v. Garcia et al.*